NORTH CAROLINA

DURHAM COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 3491

DURHAM COUNTY
FILED
JUN 30 2017
AT 2:42 __ M
CLERK OF SUPERIOR COURT

PAUL E. ENOCHS, M.D.,

Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD OF
NORTH CAROLINA,

Defendant.

**VERIFIED COMPLAINT**
**(Jury Trial Demanded)**

Plaintiff, complaining of Defendant, alleges:

## NATURE OF THE ACTION

1.      This action concerns actions by Blue Cross and Blue Shield of North Carolina

("Blue Cross") to improperly remove Dr. Paul Enochs from Blue Cross's provider network

pursuant to an inapplicable contract clause after unsuccessfully attempting to remove Dr. Enochs

from the Blue Cross network by a decredentialing process that -- upon a fair hearing of the issues

-- showed that Blue Cross did not have good cause to decredential Dr. Enochs or otherwise remove

him from the Blue Cross network.

2.      The terms of the governing agreements do not allow Blue Cross to unilaterally

terminate Dr. Enochs without cause and without due process, and such conduct is contrary to North

Carolina public policy. In addition, in light of the decredentialing process and appeal that Dr.

Enochs had to endure, and from which he emerged victorious, Blue Cross's conduct is a breach of

the implied covenant of good faith and fair dealing. It also gives rise to claims of tortious

interference with contract, tortious interference with prospective economic advantage, fraud, and

unfair and deceptive trade practices. Dr. Enochs seeks both legal and equitable relief.

3. Plaintiff Paul E. Enochs, M.D., is a physician practicing bariatric surgery in Cary, North Carolina. Dr. Enochs is a resident of Wake County, North Carolina.

4. Defendant Blue Cross and Blue Shield of North Carolina ("Blue Cross" or "Defendant") is a North Carolina non-profit corporation with its principal place of business in Durham, North Carolina.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to N.C. Gen. Stat. § 7A-243, based on an amount in controversy that exceeds $25,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over Defendant pursuant to N.C. Gen. Stat. § 1-75.4 because Defendant is incorporated under North Carolina law and has both its headquarters and principal place of business in North Carolina.

7. Venue is appropriate because Blue Cross's registered and principal office is in Durham County.

## STATEMENT OF FACTS

**I. DR. ENOCHS'S PRACTICE**

8. Dr. Enochs is a bariatric surgeon. Bariatric surgery is performed for the treatment of morbid (clinically severe) obesity. Such surgery could be a gastric restrictive procedure, a malabsorptive procedure, and (rarely) a vagal nerve blocking therapy. Attached as **Exhibit A**, is the Blue Cross Corporate Medical Policy on Surgery for Morbid Obesity, which describes the various subtypes of these procedures.

9. In addition to bariatric surgery, Dr. Enochs performs general surgeries for issues related to the gastrointestinal tract and/or the treatment of, or relief from, post-bariatric surgery symptoms. Such general surgeries could include, without limitation, gall bladder removal, hernia

repair, elimination of adhesions, small bowel resection to eliminate or shorten redundant parts of bowel left after a prior surgery. Some of these general surgeries to treat symptoms are performed years after an initial bariatric surgery, which in many cases was performed by a different surgeon.

10. Dr. Enochs has a "payor mix of patients that includes private insurance, Medicare, Medicaid, and self-pay patients. Most of Dr. Enochs's patients have private insurance. Of those patients who have private insurance, an overwhelming number of those patients are insured by Blue Cross.

11. Patients who require bariatric surgery are obese. This means that these patients have many more comorbidities than other types of surgical patients, including for example patients who need orthopedic surgery. Bariatric patients often have some combination of the following comorbidities (in addition to obesity): type 2 diabetes mellitus, hypertension, dyslipidemia (high cholesterol), cardiovascular disease, stroke, sleep apnea, gallbladder disease, hyperuricemia and gout, osteoarthritis, venous stasis disease (collection of blood in the lower limbs), and soft tissue infections.

12. Dr. Enochs practices medicine through a practice called Bariatric Specialist of North Carolina ("BSNC"). The clinical practice of that entity was acquired by and merged into Triangle Orthopaedic Associates, P.A. ("TOA") on April 1, 2014, and BSNC's clinical practice, while working under the BSNC trade name, is now a division of TOA. In July 2016, TOA changed its name to EmergeOrtho, P.A.

13. Prior to BSNC merging into TOA/EmergeOrtho, Dr. Enochs was credentialed with Blue Cross through BSNC. When BSNC was merged into TOA/EmergeOrtho, Dr. Enochs became credentialed with Blue Cross as a network provider through TOA/EmergeOrtho.

3

14.     Dr. Enochs started BSNC in 2003 in Louisburg, North Carolina, as the only practicing bariatric surgeon at the time in Franklin County or Wake County.  In 2007 after starting the bariatric programs in Rex Hospital and subsequently WakeMed Hospital, Dr. Enochs moved BSNC to Cary, North Carolina.  Because Dr. Enochs has been performing bariatric surgery in the Triangle area of North Carolina for 15 years, longer than any other private practice bariatric surgeon in the region, Dr. Enochs has more patients and a higher volume than most bariatric surgeons.  Dr. Enochs also has many return patients who come many years after an initial procedure either for a revision or treatment of other related symptoms.  Often such "follow-up" patients had their initial procedure performed by a different surgeon, sometimes in another state.  Dr. Enochs's volume of both new patients and return patients is substantially higher than most bariatric surgeons in the region.

## II.     BLUE CROSS HEALTH INSURANCE COVERAGE

15.     Blue Cross is the largest provider of private health insurance in North Carolina.

16.     According to a study by the Henry J. Kaiser Family Foundation, in 2014, Blue Cross had 73% of the market share of the "Large Group Market" enrollment in North Carolina.  A copy of the report is attached as **Exhibit B**.

17.     Blue Cross claims to have more than 3.89 million customers.  According to a study by the Henry J. Kaiser Family Foundation there were only 5.26 million North Carolinians with private health insurance in 2014.  A copy of the report is attached as **Exhibit C**.  This means that Blue Cross has nearly 74% of the private insurance market share in North Carolina.

18.     Dr. Enochs has provided services to patients covered by Blue Cross health insurance as a "participating provider" through the Network Participation Agreement that TOA/EmergeOrtho has with Blue Cross.  A copy of that Agreement (with reimbursement rate information removed) is attached as **Exhibit D**.

4

19.     The overwhelming majority of Dr. Enochs's private insurance patients are covered by Blue Cross health insurance. The removal of Dr. Enochs from the Blue Cross network would be devastating to his practice and livelihood. While patients can choose whatever doctor they want, in reality most patients cannot afford to choose a doctor who is not in their insurance company's network.

20.     Upon information and belief, Blue Cross's "out of network" policy benefits, require the patient to pay co-insurance from 30% up to 100% of the allowable charges on medical services provided, compared to "in network" benefits of only 10 to 20% of the allowable charges. "Out of network" policy benefits require the patient to pay annual deductibles ranging from $4,000 to $8,000, compared to "in network" benefits requiring patients to pay annual deductibles ranging from $0 to $3,000.

21.     In a report in the New England Journal of Medicine (N Engl J Med 2016; 375:1915-1918, November 17, 2016), Zack Cooper and Fiona Scott Morton noted that the Federal Reserve has found that almost half of all Americans could not afford to pay $400 in unexpected expenses without selling assets or borrowing money. In that report, the authors noted that if a patient goes to a health provider who is not in their plan's network, insurance might not cover any of the bill -- or might require the patient to pay a much bigger share of the bill out-of-pocket than they would have if they had gone to an in-network provider.

## III.  BLUE CROSS'S EFFORTS TO REMOVE DR. ENOCHS

### A.  2015 Decredentialing

22.     In a letter dated May 29, 2015, Blue Cross gave Dr. Enochs notice that it was decredentialing him. This meant that it would not be renewing Dr. Enochs's credentials and he would thereafter not be an "in network" provider for patients covered by Blue Cross health insurance.

5

23. The 2015 decredentialing notice was purportedly based on five issues: (1) submission of CPT codes for prior authorization that were "different from the surgical procedures performed (SIPS procedures)," (2) performance of SIPS procedures that Blue Cross considered investigational, (3) certain readmissions of patients for complications after surgery, (4) failure to respond to a letter purportedly sent by Blue Cross in March 2015, and (5) continued performance of the SIPS procedure after purportedly receiving the Blue Cross letter.

24. The network provider agreement adopts by reference Blue Cross's policies and procedures. Many of those policies and procedures are found in the "BlueBook," which is accessible at http://www.bcbsnc.com/assets/providers/public/pdfs/BlueBook_July2016.pdf. Excerpts of the BlueBook are also attached as **Exhibit E**. Sections 14.4.1 and 14.4.2 of the BlueBook grant a participating provider who has been given a notice of decredentialing a right to appeal. That appeal right has two possible levels: Level I is an appeal on written submission and documentation to the Blue Cross credentialing committee. If that appeal is unsuccessful, the provider has a right to Level II appeal, which consists of a formal hearing with witnesses being presented, questioned, and cross-examined.

25. Dr. Enochs exercised his right to appeal the 2015 decredentialing notice, which included Blue Cross's apparent attempt to instruct Dr. Enochs how to practice medicine. After expending time and money to have attorneys prepare that Level I appeal, Dr. Enochs prevailed, showing that he had not misled Blue Cross and that his readmissions rates was lower than the average for bariatric surgeons working at Blue Cross "Centers of Excellence." Blue Cross reversed its decision to decredential Dr. Enochs.

26. During Dr. Enoch's process of making submissions in support of that appeal, Blue Cross, through in-house counsel Henry Jay, asked Dr. Enochs to submit an "action plan" for Dr.

6

Enochs to agree with Blue Cross on some parameters regarding CPT codes and what to tell Blue Cross-covered patients about Blue Cross's view of the SIPS procedure so that future misunderstandings could be avoided. Counsel for Dr. Enochs submitted such an action plan to Blue Cross on July 24, 2015.

27. A week later, on August 3, 2015, Blue Cross sent its letter, from Medical Director Dr. John Smith, informing Dr. Enochs that he would be re-credentialed. In that letter Blue Cross requested that Dr. Enochs and his counsel meet with Blue Cross to discuss the action plan.

28. Blue Cross and Dr. Enochs had that meeting on October 23, 2015. Among others, Dr. Smith and Henry Jay attended that meeting on behalf of Blue Cross. Mr. Jay acknowledged that Dr. Enochs, through counsel, had submitted a proposed action plan. Mr. Jay stated that Blue Cross wanted to make some changes to the proposed plan and promised to send proposed revisions to the action plan to Dr. Enochs's counsel. However, neither Henry Jay nor anyone else at Blue Cross, sent any proposed revisions to the action plan. When counsel for Dr. Enochs sought to reach Henry Jay several months later, it was learned that Henry Jay had left employment with Blue Cross. Blue Cross never delivered any proposed revisions to the action plan nor any action plan of its own.

**B. 2016 Decredentialing**

29. In a letter dated July 6, 2016, Blue Cross once again notified Dr. Enochs that it was decredentialing him. This time the decredentialing was purportedly based on 14 items that fell into four categories: (1) six readmissions (with two more later added), (2) five admissions without prior authorization, (3) a case in which Dr. Enochs requested that anyone other than a specific Blue Cross medical director review the prior authorization request, and (4) two cases in which authorization was obtained for one procedure but another procedure was purportedly performed (SIPS).

7

30.     Once again, in his Level I appeal of this 2016 decredentialing, Dr. Enochs showed Blue Cross that his readmission rate is below the average rate of all bariatric surgeons working in Blue Cross "Centers of Excellence."   He also showed that the admissions without prior authorization were for non-bariatric surgeries that did not require prior authorization and that his practice had given Blue Cross prior notice along with a request for authorization in each case anyway.  Dr. Enochs explained his reason for asking to avoid a certain medical director when Dr. Enochs had a patient who had had a lap band procedure a number of years earlier that was now causing the patient severe symptoms and the patient needed the lap band removed and a different procedure done and the particular medical director he wished to avoid had *never* approved a revision of a lap band to another procedure.  Dr. Enochs also explained that the two cases that were approved for a two-anastomosis duodenal switch actually had that procedure done and that the hospital had accidentally pulled up the notes template for SIPS (a one-anastomosis duodenal switch).  Thus, even though the original paperwork appeared to show a different procedure being done form the one that was approved, that is not what actually happened.

31.     Despite Dr. Enochs's clear explanations in his Level I appeal of the issues presented in the 2016 Blue Cross decredentialing letter, Blue Cross upheld its decision to decredential Dr. Enochs.

32.     Dr. Enochs then made a Level II appeal under Section 14.4.2 of the BlueBook.  For this Level II appeal, Blue Cross engaged an Appeals Committee consisting of a panel of three practitioners who were not employed by Blue Cross and not in direct competition with Dr. Enochs.

33.     The Level II appeal was structured as a one-day trial with less formality than a courtroom trial, but with openings, closing, fact and expert witnesses, and direct and cross examinations.  A copy of the letter from Blue Cross attorney Chad Hansen regarding the structure,

rules, and requirements of the Level II appeal hearing is attached as **Exhibit F**. The hearing date noted in that letter was ultimately changed to March 16, 2017.

34. Dr. Enochs and his counsel exerted an enormous amount of effort into putting the materials together for the Level II hearing. Dr. Enochs engaged and paid for a bariatric surgeon from Virginia to review the cases as issue and serve as an expert witness at the hearing. The hearing itself, which took place late in the day and into the evening of March 16, 2017, lasted approximately 6 hours. Dr. Enochs expended tens of thousands of dollars for the process.

35. On March 17, 2017, the day after the Level II appeal hearing, Chad Hansen, the Blue Cross attorney who had convened the hearing panel and who represented Blue Cross at the hearing, contacted counsel for Dr. Enochs and stated -- after the hearing the night before -- it was "highly unlikely that decredentialing goes through." In other words, Dr. Enochs had won. Mr. Hansen also encouraged Dr. Enochs's lawyer to counsel Dr. Enochs to try to engage with Blue Cross -- through Dr. Smith and through Mark Werner, Blue Cross's Vice President or Network Management (who also attended the hearing). Counsel for Dr. Enochs informed Mr. Hansen that Dr. Enochs was seriously interested in such engagement and that Dr. Enochs and his counsel believed that Blue Cross and Dr. Enochs can learn from each other. On that call, Mr. Hansen also informed Dr. Enochs's counsel that that day would be his last day at Blue Cross because he was going back into practice at his former law firm. He stated that another Blue Cross attorney who had been in attendance at the hearing, Hilary Cooper, would be the new legal contact at Blue Cross for Dr. Enochs and his lawyers. Mr. Hansen forward Ms. Cooper's contact information and encouraged Dr. Enochs's lawyer to reach out through Ms. Cooper to set up a meeting with Dr. Smith and Mr. Werner.

Case 1:17-cv-00650-LCB-JLW   Document 2   Filed 07/13/17   Page 9 of 21

36. According to the BlueBook and to the Blue Cross letter setting for the Level II appeal requirements, the results of the hearing were to be determined within 5 days after the hearing and mailed by certified letter to Dr. Enochs. On the March 17 call, Dr. Enochs's lawyer asked Mr. Hansen whether it would be appropriate to make contact immediately to try to set up meetings with Dr. Smith and Mr. Werner or whether Dr. Enochs should wait for the 5 days to run and the official decision to be issued. Mr. Hansen said that it would be best to let the 5 days run first.

37. Having received no decision in the mail, counsel for Dr. Enochs contacted Hilary Cooper on March 28, 2017. In a phone call with Dr. Enochs's counsel that day, Ms. Cooper confirmed that Dr. Enochs had won the appeal and that the decision was to reverse the decredentialing. Ms. Cooper told Dr. Enochs's attorney that Blue Cross was working on "some stipulations" to include in the decision. When Dr. Enochs's attorney informed Ms. Cooper that Dr. Enochs would like to set up meetings between Dr. Enochs and Dr. Smith and Mr. Warner, as suggested by Chad Hansen, Ms. Cooper suggested and agreed that it would make sense for such a meeting to occur "before the stipulations are finalized."

38. Thereafter, the parties worked to set up the planned meeting. After exchanging voicemails on April 5, Dr. Enochs's lawyer and Ms. Cooper engaged in email correspondence from April 5 through April 21, 2017 regarding the meeting. A copy of that email thread is attached as **Exhibit G**. In that correspondence, a meeting was proposed for April 19, but then postponed. Later, a meeting time of 3:00-4:00 p.m. on April 26 was agreed. As the date approached, counsel for Dr. Enochs inquired about the location of the meeting. On April 20, Ms. Cooper responded that the meeting would have to be canceled because she was also leaving Blue Cross. Ms. Cooper

10

stated that Brian Vick, another Blue Cross attorney, would be the new point of contact for Dr. Enochs and his lawyers.

39. The next day, counsel for Dr. Enochs wrote to Mr. Vick and asked for new availability information for a meeting with Mr. Werner and Dr. Smith.

**C. 2017 Termination**

40. For more than a week after Dr. Enochs's counsel reached out to Mr. Vick seeking to set up the promised meeting, Mr. Vick did not respond. Nor did anyone else from Blue Cross respond. Then on May 1, 2017, Mr. Vick sent an email informing counsel for Dr. Enochs that Blue Cross "will not be proceeding further with the recent credentialing action involving Dr. Enochs" because Blue Cross had notified EmergeOrtho that Blue Cross was "exercising [its] right under [its] Network Participation Agreement ("NPA") with EmergeOrtho to remove Dr. Enochs from the roster of participating providers under the NPA." Mr. Vick went on to say that "[t]his is a discretionary termination of Dr. Enochs' participation in the provider network that serves Blue Cross NC's non-Medicare health plans and is being made without cause and upon 90-days' notice." A copy of that email is attached as **Exhibit H**.

41. On May 2, 2017, EmergeOrtho received by email from Blue Cross an electronic version of the letter that was going out by mail that day and that was ultimately delivered to EmergeOrtho. A copy of that letter is attached as **Exhibit I**.

42. In the May 2, 2017 Blue Cross letter, signed by Mark Werner, Blue Cross again stated that it is "exercising its rights under Sections 2.2.6.3 and 5.2 of your Network Participation Agreement ("NPA") to remove Dr. Paul Enochs from your Practitioner Roster without cause and upon 90-days prior written notice."

11

43. A review of those sections, however, reveals that the NPA does not give Blue Cross the right to remove Dr. Enochs from the Practitioner Roster without cause. See **Exhibit D**. Section 2.2.6.3 states:

> We reserve the right to remove individual Practitioners from the Practitioner Roster Exhibit in the event of exclusion pursuant to Sections 2.3.2 or 5.2.

Section 5.2 states:

> Termination. This Agreement may be terminated at any time by either party, with cause, upon providing Written Notice of intent to terminate due to material breach of this Agreement and allowing the breaching party no fewer than thirty (30) days to cure. If at the end of such 30-day period the breach has not been cured, the non-breaching party may terminate immediately upon Written Notice to the breaching party. After the initial term, this Agreement may be terminated by either party, without requirement of cause, upon no fewer than ninety (90) days' prior Written Notice to the other, such termination to be effective no earlier than the last day of the initial term. In addition, this Agreement may be terminated immediately by us at our sole option and discretion upon any of the occurrences described in Sections 2.2.1.4, 2.2.4 or 2.2.5.2 through 2.2.5.5, and 2.3.2, whether or not you notify us as may be required by such Sections.

By its plain language, Section 5.2 only gives Blue Cross rights regarding termination of the entire agreement. It says nothing about an "event of exclusion" of an individual practitioner. Furthermore, even if anything in those sections could be somehow twisted to allow the removal of an individual practitioner, nothing in those sections provides Blue Cross a right to remove an individual practitioner without cause.

44. On May 3, 2017, Blue Cross's Mark Werner sent EmergeOrtho another letter. This one informed EmergeOrtho that Blue Cross was providing 30 days written notice that it was amending the Medicare Provider Agreement between Blue Cross and EmergeOrtho. That agreement concerns the plan through which Blue Cross provides coverage to individuals who have selected coverage under Part C of the United States government's Medicare Program (also known

12

as Medicare Advantage). The amendment was to add a clause allowing Blue Cross to remove any individual participating provider without cause on 90 days prior written notice. A copy of that letter is attached as **Exhibit J**. While the letter informed EmergeOrtho that it had a right to file an objection to the amendment, which action would give Blue Cross the right to terminate the entire contract, EmergeOrtho took no action -- presumably because of the threat of Blue Cross terminating the contract.

45. Blue Cross's action in amending that contract appears to violate North Carolina law because it did not provide at least 60 days from the date of receipt to object to the proposed amendment as required by N.C. Gen. Stat. § 58-50-280(b).

46. On June 8, 2017, Blue Cross's Mark Werner sent a letter to EmergeOrtho removing Dr. Enochs as a participating provider under the Medicare Provider Agreement, on 90 days written notice "without cause." A copy of that letter is attached as **Exhibit K**.

47. Blue Cross's action in attempting to remove Dr. Enochs as a practitioner from the Medicare Advantage Program contract pursuant to the new amendment Blue Cross had purportedly added to the contract, and the amendment itself, violate federal law and rules governing the requirements for terminating a physician's participation in a Medicare Advantage organization. Specifically, 42 C.F.R. § 422.202 requires that:

> An MA organization that suspends or terminates an agreement under which the physician provides services to MA plan enrollees must give the affected individual written notice of the following:
>
> (i) The reasons for the action, including, if relevant, the standards and profiling data used to evaluate the physician and the numbers and mix of physicians needed by the MA organization.
>
> (ii) The affected physician's right to appeal the action and the process and timing for requesting a hearing.

13

### D. Notices to Dr. Enochs's Patients

48.    On May 11, Blue Cross began delivering letters to Dr. Enochs's patients indicating that Dr. Enochs "is no longer part of [Blue Cross's] network as of July 30, 2017." Among other things, those letters stated the following:

> This most often means that the doctor has left the office, moved, or retired. Sometimes there are also other reasons. If Paul E. Enochs, M.D. has not left the area and you keep getting care from this doctor, your level of health plan coverage will change because they are no longer in our network. You can see another doctor at this practice if he or she is in our network.

A redacted copy of one such letter is attached as **Exhibit L**.

49.    Upon information and belief, Blue Cross sent a letter like this to every Blue Cross-covered patient who saw Dr. Enochs at any time within the year leading up to the date of the letter.

## IV.    INDICIA OF BLUE CROSS'S PARTIAL INTENT

50.    Upon information and belief, Dr. Janet McCauley, Senior Medical Director at Blue Cross, along with three of her colleagues, participated in a conference call in October 2016 with several bariatric surgeons who are members of the American Society for Metabolic and Bariatric Surgery ("ASMBS"). Upon information and belief, Dr. McCauley and her colleagues told the surgeons that Blue Cross was losing money on its ACA exchange-provided health insurance business and that Blue Cross was looking for places to save money. Upon information and belief, Dr. McCauley and her colleagues stated that they had been told that a decision had been made on the benefit side of Blue Cross to try to slow down bariatric surgery for twelve months, and they stated that they were being forced to figure out a medical policy to match accordingly. One or more of those surgeons reported that conversation to attendees, including Dr. Enochs, during the State Chapter meeting at the national ASMBS conference in New Orleans in November 2016.

14

## V.    DR. ENOCHS'S STATUS UNDER THE CONTRACTS

51.    Dr. Enochs's protections under the contract are afforded him because, as an individual practitioner at EmergeOrtho, he is a party to the contract.  Section 2.2.6 of the contract states "[a]ll individual Practitioners subject to the terms of this Agreement are listed on the Practitioner Roster Exhibit."   When the clinical practice of BSNC was merged into TOA/EmergeOrtho in 2014, Dr. Enochs was, pursuant to the contract, added to the Practitioner Roster Exhibit.

52.    Consistent with Dr. Enochs's status as a party to the contract, the contract -- along with Blue Cross policies incorporated into it -- provides Dr. Enochs certain rights, including the right to a fair hearing on decredentialing decisions, and the right not to be terminated as a Participating Provider other than as allowed by the contract, including implied covenants and other applicable law.

## FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT

53.    Plaintiff realleges and incorporates all of the foregoing paragraphs of the complaint.

54.    The Court should declare that Blue Cross has no right to remove Dr. Enochs as a participating provider under the plain language of the contract.

55.    The Court should declare that Blue Cross's attempt to remove Dr. Enochs as a participating provider is inextricably linked to the issues for which there was an appeal and a hearing, and that Blue Cross's attempt to remove Dr. Enochs as a participating provider is a bad faith end run around the fair hearing process and results.

56.    The Court should declare that Blue Cross's attempt to remove Dr. Enochs as a participating provider is a violation of the public policy of North Carolina prohibiting an insurer from discriminating against providers who serve populations that present a risk of higher-than-

15

average claims or health care services utilization as stated in the North Carolina General Statutes at §58-3-200(e) ("No insurer shall establish provider selection or contract renewal standards or procedures that are designed to avoid or otherwise have the effect of avoiding enrolling high-risk populations by excluding providers because they are located in geographic areas that contain high-risk populations or because they treat or specialize in treating populations that present a risk of higher-than-average claims or health care services utilization." (emphasis added))

57.     The Court should declare that Blue Cross's attempt to remove Dr. Enochs as a participating provider is a violation of public policy because the June 8, 2017 termination notice removing Dr. Enochs as a participating provider under the Medicare Advantage fails to comply with federal law and rules governing the requirements for terminating a physician's participation in a Medicare Advantage organization, specifically, 42 C.F.R. § 422.202.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT - IMPROPER REMOVAL

58.     Plaintiff realleges and incorporates all of the foregoing paragraphs of the complaint.

59.     Blue Cross has materially breached the provider Agreement by purporting to remove Dr. Enochs from the network without cause when no provision of the agreement allows Blue Cross to take such action and by sending letters to Dr. Enochs's patients telling them that Dr. Enochs is being removed from the network.

60.     Dr. Enochs has been damaged by Blue Cross's breach of the contract in an amount to be proved at trial, but not less than $25,000.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT - DUTY OF GOOD FAITH AND FAIR DEALING

61.     Plaintiff realleges and incorporates all of the foregoing paragraphs of the complaint.

62.     Blue Cross has breached the implied covenant of good faith and fair dealing by causing Dr. Enochs to go through a Level II appeal process to avoid decredentialing and then refusing to honor the results of that process.

63.     Dr. Enochs has been damaged by Blue Cross's breach of the contract in an amount to be proved at trial, but not less than $25,000.

## FOURTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH CONTRACT

64.     Plaintiff realleges and incorporates all of the foregoing paragraphs of the complaint.

65.     Dr. Enochs has contract relationships with his patients who are Blue Cross customers.  Those patients have set appointments and have agreed to pay him for his services -- both through their insurance companies and by contributing their co-pays and/or co-insurance payments.

66.     Blue Cross is well aware of Dr. Enochs's relationships with his patients.

67.     By removing Dr. Enochs from the Blue Cross network, Blue Cross is intentionally inducing Dr. Enochs's patients to discontinue their relationship with Dr. Enochs, as evidenced in part by the letter that Blue Cross sent to Dr. Enochs's patients.

68.     Blue Cross has interfered with Dr. Enochs's relationship with his patients without justification.

69.     Blue Cross's interference with Dr. Enochs's relationship with his patients has caused actual pecuniary harm and will continue to cause such harm to Dr. Enochs.

## FIFTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

70.     Plaintiff realleges and incorporates all of the foregoing paragraphs of the complaint.

71.     Dr. Enochs has relationships with his patients who are Blue Cross customers even if those patients do not have pending appointments with or requests for services from Dr. Enochs.

17

Those patients -- absent Blue Cross's interference -- will set future appointments and seek services from Dr. Enochs.

72.     Blue Cross is well aware of Dr. Enochs's relationships with his patients.

73.     By removing Dr. Enochs from the Blue Cross network, Blue Cross is intentionally interfering with Dr. Enochs's relationship with his patients and, as evidenced in part by the letter that Blue Cross sent to Dr. Enochs's patients, causing them not to set future appointments with Dr. Enochs.

74.     Blue Cross has interfered with Dr. Enochs's relationship with his patients without justification.

75.     Blue Cross's interference with Dr. Enochs's relationship with his patients has caused actual pecuniary harm and will continue to cause such harm to Dr. Enochs.

## SIXTH CAUSE OF ACTION
### FRAUD

76.     Plaintiff realleges and incorporates all of the foregoing paragraphs of the complaint.

77.     Blue Cross stated in its policies that a provider who is decredentialed will have a right to appeal at two levels and will have the opportunity to have Blue Cross's decredentialing decision reversed.

78.     Blue Cross specifically stated to Dr. Enochs in its January 19, 2017 to his lawyer that Dr. Enochs's Level II appeal of decredentialing would be heard by a panel of three practitioners and that the results of that appeal would determine whether the decredentialing would go through or whether Dr. Enochs would be allowed to remain a participating provider in the Blue Cross network.

79.     Blue Cross's admission that the decision after the Level II appeals hearing was to reverse decredentialing and Blue Cross's action shortly thereafter to remove Dr. Enochs from

18

being a participating provider in the Blue Cross network anyway shows that Blue Cross had no intention of honoring the results of the decredentialing appeal process.

80.     Dr. Enochs relied on Blue Cross's representation that the results of the Level II appeals process would be honored, and he spend substantial time and money to participate in that process and convince the panel that decredentialing was inappropriate.

81.     Dr. Enochs was damaged by his reliance on Blue Cross's false representations.

**SEVENTH CAUSE OF ACTION**
**UNFAIR AND DECEPTIVE TRADE PRACTICES**

82.     Plaintiff realleges and incorporates all of the foregoing paragraphs of the complaint.

83.     Blue Cross's actions described in this Complaint were unfair and deceptive in violation of N.C. Gen. Stat. § 75-1.1.

84.     Blue Cross's actions described in this Complaint were in commerce as required by that statute.

85.     Dr. Enochs has been and will continued to be harmed by Blue Cross's unfair and deceptive actions.

**PRAYER FOR RELIEF**

Plaintiff prays:

1. That this matter be tried before a jury.

2. That the Court declare that:

   (a)     Blue Cross has no right to remove Dr. Enochs as a participating provider under the plain language of the contract.

   (b)     Blue Cross's attempt to remove Dr. Enochs as a participating provider is inextricably linked to the issues for which there was an appeal and a hearing, and Blue Cross's attempt to remove Dr. Enochs as a participating provider is a bad faith end run around the fair hearing process and results.

   (c)     Blue Cross's attempt to remove Dr. Enochs as a participating provider is a violation of the public policy of North Carolina prohibiting an insurer from

19

discriminating against providers who serve populations that present a risk of higher-than-average claims or health care services utilization as stated in the North Carolina General Statutes at §58-3-200(e).

(d) Blue Cross's attempt to remove Dr. Enochs as a participating provider is a violation of public policy because the June 8, 2017 termination notice removing Dr. Enochs as a participating provider under the Medicare Advantage fails to comply with federal law and rules governing the requirements for terminating a physician's participation in a Medicare Advantage organization found in 42 C.F.R. § 422.202.

3. That the Court enter a preliminary injunction and permanent injunction requiring Blue Cross not to remove Dr. Enochs as a participating provider in its networks without cause and without the right to a fair hearing and requiring Blue Cross to contact the patients to whom it sent notices about Dr. Enochs's removal from the Blue Cross network and inform them, with appropriate and agreed language, that Dr. Enochs remains in the Blue Cross network.

4. That the Court order Blue Cross to pay damages to Dr. Enochs in an amount to be determined at trial but not less than $25,000.

5. That the Court order Blue Cross to pay punitive damages to Dr. Enochs for Blue Cross's fraud.

6. That, pursuant to N.C. Gen. Stat. § 75-16, the Court order Blue Cross to pay Dr. Enochs treble damages for Blue Cross's conduct in violation of N.C. Gen. Stat. § 75-1.1.

7. That, pursuant to N.C. Gen. Stat. § 75-16.1, the Court order Blue Cross to pay Dr. Enochs's attorneys' fees.

8. That the Court award Plaintiff prejudgment interest.

9. For all other relief that is just and proper.

Dated: June 30, 2017

John A. Zaloom (N.C. Bar No. 30557)
Moore & Van Allen, PLLC
P.O. Box 13706
Research Triangle Park, NC 27709
Telephone: (919) 286-8182
Fax: (919) 286-8199
Attorneys for Plaintiff

20

## <u>VERIFICATION</u>

The undersigned affiant appeared personally before me and, being duly sworn, deposes and says that he is the Plaintiff named in this action, and that he is familiar with the transactions and facts stated in the above Complaint; that he has read the Complaint; that the facts stated in the Complaint are true, except those matters stated on information and belief, and as to those, he believes them to be true.

Paul E. Enochs, M.D.

SWORN to before me this
__30th__ day of __June__, 2017.

Notary Public for North Carolina

My Commission Expires: __02/13/18__

21